STATE OF NORTH CAROLINA v. MILTON LEE BUCK, JR.

No. 697SC423

(Filed 17 December 1969)

**1. Criminal Law § 104— nonsuit — consideration of evidence**

On motion for judgment as of nonsuit in a criminal case, the evidence must be considered in the light most favorable to the State, and if there is any competent evidence to support the allegation of the bill of indictment, the case is one for the jury.

**2. Homicide § 14— presumptions from the use of a deadly weapon**

Where death proximately results from the intentional use of a deadly weapon, the presumptions arise (1) that the killing was unlawful and (2) that it was done with malice, thereby constituting the felony of murder in the second degree.

**3. Homicide § 21— second-degree murder — use of knife — nonsuit**

In a prosecution for murder in the second degree committed with a knife, there was sufficient evidence of defendant's guilt to require submission of the case to the jury.

**4. Homicide § 27— instruction on involuntary manslaughter**

In a prosecution for murder in the second degree, the trial court is not required to instruct the jury on involuntary manslaughter where there is no evidence to support such instruction.

**5. Criminal Law § 112— instruction on circumstantial evidence**

If the charge of the court is correct as to burden and measure of proof, the court is not required, absent a specific request, to instruct the jury on the definition and consideration of circumstantial evidence.

**6. Indictment and Warrant § 11— identification of victim — variance**

Where the indictment charged the defendant with the murder of "Sidney Lee Summerlin" and there was evidence that "Sidney Zeno Summerlin" was the victim, there is no fatal variance when there is other evidence that the two names described the same person; moreover, a variance as to middle names is usually immaterial.

APPEAL by defendant from *May, S.J.,* 24 February 1969 Term, EDGECOMBE Superior Court.

The defendant, Milton Lee Buck, Jr., (Buster), was tried upon a bill of indictment charging him with the murder of Sidney Lee Summerlin. When the case was called for trial, the solicitor announced that he would not try the defendant for murder in the first degree but would, instead, try him for murder in the second degree or manslaughter.

The defendant, in open court, entered a plea of not guilty to the charge and trial was by jury. The jury returned a verdict of guilty to murder in the second degree. The court entered judgment that the defendant be imprisoned for not less than twelve nor more than fifteen years in the State's Prison.

From the judgment imposed, the defendant appealed, assigning errors.

*Robert Morgan, Attorney General, by Jean A. Benoy, Deputy Attorney General, and Russell G. Walker, Jr., Staff Attorney, for the State.*

*Cameron S. Weeks for the defendant appellant.*

HEDRICK, J.

The defendant's first assignment of error is to the overruling of his motion for judgment as of nonsuit.

The State's evidence is summarized as follows: On the afternoon of 7 December 1968 several men were gathered at Braddy's Amoco Station on Trade Street in the Town of Tarboro, North Carolina. They had made several trips to the local ABC store and they had been talking and drinking together all afternoon. Among those present were the deceased, Sidney Summerlin, and the defendant, Buster Buck. Buster went into the bathroom, and the deceased went to the door and held the doorknob. Buster was very upset when he could not get out and told him to let go of the door or he would kick it in. The deceased released the door and walked away. Buster kicked a panel out of the door. Dick Braddy, operator of the station, pushed open the door and told Buster he would have to fix it. The evidence showed that Braddy had been whittling and had a knife in his hand and that after they had exchanged several words, Buster said, "Well, you've got a knife and I've got one. Let's go." Braddy folded his knife, put in in his pocket, and told Buster to leave. Buster went to the front of the station and stood with the knife in his hand with the blade open. Gary Scott testified:

> "I started over towards Buster and told him that he was wrong. He pushed me. Then Sidney grabbed the broom. Dick Braddy told Sidney to put the broom down, that he didn't want any trouble in the station. Dick Braddy asked Buster Buck two or three times to leave. Then Buster left."

After Buster left the station, he turned and yelled that he "had something for you." The evidence does not indicate to whom he was talking, but it does show that the deceased responded. David Mitchell Chappell testified that "Sidney went outside. Sidney had the broom in his hand but as he started out the door he laid the broom up against the drink box. The drink box is right there at the door. Sidney and Buster started fighting."

Gary Scott testified:

> "Sidney walked over to the door with the broom in his hand. Buster told him to come on out. Then Buster (sic) put the broom down by the drink machine and walked outside. They started tussling. When I saw Sidney walk outside I did not see him have anything but the broom, which he put down. I never saw Sidney with a knife, a pistol, or anything."

James Earl Kea testified that he was about three feet from the door when the deceased went out and that ". . . Milton Buck had his knife in his right hand. . . . As Sidney got close to Buck, I don't know whether he was afraid Sidney was going to hit him or not but he did like that (witness indicating) and they went together fighting."

They began fighting and both fell to the ground where they continued to scuffle. They fought until Gary Scott stopped the fight by placing his foot on the side of Buster Buck's head. Kea testified that at that time Buster had Sidney's head back and asked Sidney if he wanted to die. Buster got up off Sidney and struck Scott, knocking him down. Each witness testified that they did not see Buster strike the deceased with a knife but that they first saw the blood on the chest of the deceased when they turned him over. They rushed the deceased to the hospital where he died shortly thereafter.

Dr. John I. Brooks, a Tarboro physician, testified that he saw Sidney Summerlin in the emergency room of Edgecombe General Hospital on 7 December 1968. Dr. Brooks testified as to the appearance of the victim and described the wounds he found on his body. He stated that in his opinion Summerlin died of hemorrhagic shock or blood loss from the wounds which were on his body. On cross-examination, in response to a question asked by the defendant's attorney, Dr. Brooks stated that in his opinion the wounds could have been caused by a knife.

[1] The well settled rule in this jurisdiction is that in a criminal case when there is a motion for judgment as of nonsuit, "the evidence must be considered in the light most favorable to the State, and if when so taken there is any competent evidence to support the allegation of the bill of indictment, the case is one for the jury. And, on such motion the State is entitled to the benefit of every reasonable inference that may be fairly deduced from the evidence." *State v. Block,* 245 N.C. 661, 663, 97 S.E. 2d 243 (1957); *State v. Richardson,* 2 N.C. App. 523, 163 S.E. 2d 423 (1968).

[2] The North Carolina Supreme Court, speaking through Parker, C.J., in *State v. Cooper,* 273 N.C. 51, 159 S.E. 2d 305 (1968), said:

". . . . When the State satisfies the jury from the evidence beyond a reasonable doubt that the defendant intentionally shot the deceased or the defendant admits that he intentionally shot the deceased, and thereby proximately caused his death, it raises two presumptions against him: (1) That the killing was unlawful, and (2) that it was done with malice. This constitutes the

felony of murder in the second degree. *S. v. Gregory,* 203 N.C. 528, 166 S.E. 387; *S. v. Wagoner,* 249 N.C. 637, 107 S.E. 2d 83; *S. v. Phillips,* 264 N.C. 508, 142 S.E. 2d 337; 2 Strong, N.C. Index, Homicide, § 13. The intentional use of a deadly weapon as a weapon, when death proximately results from such use, gives rise to the presumptions. *S. v. Gordon,* 241 N.C. 356, 85 S.E. 2d 322; *S. v. Phillips, supra.* When the presumption from the intentional use of a deadly weapon obtains, the burden is upon the defendant to show to the satisfaction of the jury the legal provocation that will rob the crime of malice and thus reduce it to manslaughter or that will excuse it altogether upon the grounds of self-defense. *S. v. Mangum, supra* [245 N.C. 323, 96 S.E. 2d 39]; *S. v. McGirt,* 263 N.C. 527, 139 S.E. 2d 640; *S. v. Todd,* 264 N.C. 524, 142 S.E. 2d 154. When defendant rebuts the presumption of malice only, the presumption that the killing was unlawful remains, making the crime manslaughter. 2 Strong, N.C. Index, Homicide, § 13."

**[3]**   When the above principles are applied to the evidence in this case, there was plenary evidence to justify its submission to the jury, and there was no error by the trial court in overruling defendant's motion for judgment as of nonsuit. This assignment of error is overruled.

**[4]**   The defendant next assigned as error the refusal of the court to grant his request for instructions regarding involuntary manslaughter.

"In the case of *State v. Satterfield,* 198 N.C. 682, 684, 153 S.E. 155 (1930), Adams, J. said: 'This offense (involuntary manslaughter) consists in the unintentional killing of one person by another without malice (1) by doing some unlawful act not amounting to a felony *or naturally dangerous to human life;* or (2) by negligently doing some act which in itself is lawful; or (3) by negligently failing or omitting to perform a duty imposed by law. These elements are embraced in the offense as defined at common law. Wharton, Homicide, 7; 1 Crim. Law (11 Ed.) 622; 1 McClain on Crim. Law, 303, sec. 335; Clark's Crim. Law 204. The definition includes unintentional homicide resulting from the performance of an unlawful act, from the performance of a lawful act done in a culpably negligent way, and from the negligent omission to perform a legal duty.' (emphasis added.)" *State v. Hamilton and State v. Beasley,* 1 N.C. App. 99, 160 S.E. 2d 79 (1968).

See also *State v. Honeycutt,* 250 N.C. 229, 108 S.E. 2d 485 (1959), where this definition was quoted with approval.

> "To constitute involuntary manslaughter, the homicide must have been without intention to kill or inflict serious bodily injury, and without either express or implied malice. *S. v. Honeycutt,* 250 N.C. 229, 108 S.E. 2d 485; *S. v. Satterfield,* 198 N.C. 682, 153 S.E. 155; 40 C.J.S., Homicide, sec. 56." *State v. Foust,* 258 N.C. 453, 128 S.E. 2d 889 (1963).

The evidence presented in the instant case does not require the court to include instructions on involuntary manslaughter.

**[5]** The defendant's next assignment of error was to the failure of the judge to instruct the jury concerning the law of circumstantial evidence.

The record on appeal does not reveal to us any request by the defendant that the court define circumstantial evidence or instruct the jury on how to appraise such evidence. Indeed, the defendant only requested that the court instruct the jury on the law concerning involuntary manslaughter and the law concerning accident and misadventure. It is settled law that if the charge of the court is correct as to burden and measure of proof, then absent a specific request to instruct the jury as to circumstantial evidence, the failure to so charge is not reversible error. *State v. Warren,* 228 N.C. 22, 44 S.E. 2d 207 (1947). The charge is free from prejudicial error.

**[6]** The defendant's fourth assignment of error was to the court's refusal to grant his motion to set aside the verdict, for a new trial, and in arrest of judgment, and in signing the judgment. The defendant contends that there was a fatal variance between the evidence and the allegations in the bill of indictment in that the indictment charged the defendant with the murder of "Sidney Lee Summerlin" and the evidence at the trial was that "Sidney Zeno Summerlin" was the victim. Appellant contends that the record is devoid of any evidence that these two names described the same person. We find this contention to be untenable. The first witness for the State, Raymond Earl Joyner, a Tarboro police officer, stated that he ". . . knew Sidney Lee or Sidney Zeno Summerlin." The North Carolina Supreme Court, speaking through Clark, J., in *State v. Hester,* 122 N.C. 1047, 1050 (1898), said:

> "Besides middle names and middle initials are immaterial and variances in that respect will not be considered, for the common law recognizes only one Christian name, 17 A. & E. Enc., 114,

and judicial notice will be taken of the ordinary abbreviations of Christian names."

See also an excellent annotation in 15 A.L.R. 3d 963, 981.

The fifth and sixth assignments of error are not based on exceptions taken and are therefore not properly taken.

We have, however, considered these assignments of error and have found no prejudicial error.

After a careful examination of the record, we find

No error.

MALLARD, C.J., and MORRIS, J., concur.